# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2280

_____

|  |  |  |
|---|---|---|
| United States of America, | * |  |
|  | * |  |
| Appellee, | * |  |
|  | * | Appeal from the United States |
| v. | * | District Court for the |
|  | * | District of South Dakota. |
| Adam C. Bordeaux, | * |  |
|  | * |  |
| Appellant. | * |  |

_____

Submitted: February 11, 2009
Filed: July 7, 2009

_____

Before BYE, JOHN R. GIBSON, and GRUENDER, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Adam C. Bordeaux was convicted of one count of assault with a dangerous weapon in violation of 18 U.S.C. §§ 1153 and 113(a)(3); three counts of assault with a dangerous weapon against a child who had not attained the age of 18 years in violation of 18 U.S.C. §§ 1153, 113(a)(3) and 3559 (the Adam Walsh Act); and one count of discharging a firearm during a crime of violence in violation of 18 U.S.C. §§ 1153, 113(a)(3), and 924(c)(1)(A)(iii). He was acquitted of a second count of assault with a dangerous weapon. Pursuant to statutory provisions establishing mandatory minimums and requiring the imposition of a consecutive term for violation of 18

U.S.C. §924(c)(1)(A)(iii), the district court[1] sentenced Bordeaux to 240 months' imprisonment, the bottom of the adjusted Guidelines range. Bordeaux appeals his conviction, arguing that the district court erred in denying his motion for judgment of acquittal because there was insufficient evidence of Bordeaux's intent. Alternatively, Bordeaux asserts that the district court erred in denying his motion for a new trial, and that his substantial rights were impacted by two erroneous evidentiary rulings. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

On the night of July 4, 2007, Adam Bordeaux, his girlfriend, Frances Spotted War Bonnet, their baby, and Bordeaux's friend Jeff Prue went to Bordeaux's mother's house to set off fireworks with other friends and family members. While at his mother's house, Bordeaux retrieved his gun, a semiautomatic Hi-Point 995 Pro 9 mm carbine rifle, as well as some ammunition, and put them in the trunk of his car. Later, Bordeaux drove the foursome to the Paul Mart gas station and convenience store in Rosebud, South Dakota to drop off Prue. When Bordeaux arrived at Paul Mart, Tristan Saupitty was there filling his car with gas. Saupitty had been driving back from a fireworks celebration at the Tribes Casino with passengers R.F., W.S., L.R.B., and Michelle Boyd when his vehicle ran out of gas. Luke Burning Breast towed Saupitty and his passengers to Paul Mart to refuel.

Bordeaux saw Saupitty and his four passengers, but Bordeaux and Saupitty did not orally acknowledge one another at Paul Mart. However, Bordeaux later told a police officer that seeing Saupitty made him worry that Saupitty might harm him. At trial, Bordeaux testified that Saupitty had previously threatened to harm him or his

---

[1]The Honorable Patrick A. Conmy, District Judge for the District of North Dakota, sitting by designation.

family's property.  Bordeaux told police investigators that he believed that Saupitty and R.F. had shot out several windows on Bordeaux's mother's car.

When Bordeaux left the gas station with Spotted War Bonnet and their baby still in the car, he turned right and went down the road toward the Rosebud Dam, stopped the car, and took the rifle out of the trunk and placed it on the front seat.  He then drove to Spotted Tail Drive and turned down the road.  Around the same time, Saupitty and his passengers left Paul Mart and went to get money to pay Burning Breast for the tow.  Burning Breast followed Saupitty in a second car along with a passenger.  Saupitty turned onto Spotted Tail Drive, encountering Bordeaux for the second time that evening.  The following facts are disputed, but Bordeaux, Spotted War Bonnet, and Burning Breast testified that Saupitty accelerated and swerved his car toward Bordeaux's.  Saupitty testified that he did not even notice Bordeaux, and R.F. testified that Saupitty did not swerve.  After this incident, Bordeaux continued to his cousin Robert Jordan's house on Main Street.  Saupitty also stopped his car on Main Street to speak with a friend, C.F., within view of Jordan's house.  Burning Breast continued to follow behind Saupitty.

After speaking with C.F. for a few minutes, Saupitty began driving in the direction of Jordan's house where Bordeaux was standing near his car.  Bordeaux testified that he shot at Saupitty because Saupitty was driving in a threatening manner toward his car, while Spotted War Bonnet and the baby were still inside it.  Saupitty testified that his car was still stopped when Bordeaux fired the first shots.  Bordeaux also testified that he was only trying to disable the vehicle.  Four shots hit the front of the car, near the radiator and license plate and in the left-front corner of the hood.  As Saupitty approached Bordeaux's car, he swerved toward it, and then continued past Bordeaux. Bordeaux fired two shots at the side of the car: one on the driver-side door, and one near the gas cap cover.  Bordeaux shot at the car four more times after it passed him; two of the shots broke out the back windshield and two other shots hit the driver's side rear taillight.  He testified that the final shots were to frighten Saupitty

and keep him from "com[ing] around again. . . ." No one was seriously injured in Saupitty's car, but he and the four passengers testified that they were frightened. Investigators later recovered bullet fragments from the car's interior, including from the headrest, the dashboard, and a floor mat. In addition to the back windshield being broken out by two shots, another shot traveled through the front windshield of the car.

After the shooting, Bordeaux went to his sister's home, left Spotted War Bonnet and the baby there, and threw his gun into some weeds in the backyard. He then went to Jordan's sister's home to stay the night. The next day, Bordeaux turned himself in after stopping to see his baby daughter. Bordeaux was charged with five counts of assault with a dangerous weapon (Count I was for assaulting Saupitty; Counts II-V were for assaulting the four passengers) and one firearms charge (Count VI).

At trial, Bordeaux argued that he acted in self-defense, and the jury was instructed on the defense. The jury acquitted Bordeaux of the assault charge against Saupitty, but convicted him of assaulting all four passengers. In addition, Bordeaux was convicted of the firearms charge. He appeals from his conviction.

II.

Bordeaux's first contention is that the district court abused its discretion by denying his motion for a mistrial. Bordeaux's motion alleged that the district court made a comment prejudicial to Bordeaux during voir dire. We review the trial court's denial of Bordeaux's motion for a mistrial for abuse of discretion. See United States v. Herron, 539 F.3d 881, 887 (8th Cir. 2008) (standard of review). We must "balance and weigh the comments of the judge against the overall fairness of the trial." United States v. Castro-Higuero, 473 F.3d 880, 887 (8th Cir. 2007) (quoting United States v. Lueth, 807 F.2d 719, 727 (8th Cir. 1986)).

A trial judge must not "do or say anything that might prejudice either litigant in the eyes of the jury." Coast-to-Coast Stores, Inc. v. Womack-Bowers, Inc., 818 F.2d 1398, 1401 (8th Cir. 1987). However, "[w]e have always been reluctant to disturb a judgment of conviction by reason of a few isolated, allegedly prejudicial comments of a trial judge." Castro-Higuero, 473 F.3d at 887. While summarizing the charges against Bordeaux, the district court stated, "Discharge of a rifle at a vehicle, five occupants in the vehicle, not a good thing, of course. But does anyone, based on that, reach a conclusion of guilt or innocence?" It would have been preferable to avoid this statement, and we discourage needless commentary from the court at all stages of trial, including voir dire. However, we conclude that this remark was not unduly prejudicial. The challenged statement, that shooting a rifle at a vehicle full of people was "not a good thing," was unlikely to influence the potential jurors. Absent this comment, the jurors would not have drawn a contrary conclusion. There is nothing controversial or alarming about the remark, which is a far cry from the type we have previously found to be prejudicial. In Coast-to-Coast, we found fault with a remark that the plaintiff's "first witness had 'hung them out to dry,' that no evidence of fraud had been produced, and that the court would not let stand a jury verdict finding fraud." 818 F.2d at 1401. In contrast, here, the judge drew no such conclusions about Bordeaux's guilt or innocence.

Assuming arguendo that the court's comment was potentially prejudicial, a review of the record as a whole leads us to conclude that the trial's overall fairness was not impacted by the court's passing comment. "The potential prejudice of the statement is sufficiently mitigated when placed in the context of the court's other statements to the jury." Castro-Higuero, 473 F.3d at 888. The comment was made while the court was questioning potential jurors about whether they could approach the facts of the case without bias or prejudice. Rather than suggest that the jurors should be constrained to reach one outcome, the court was clearly expressing that it wanted the jurors to evaluate the facts without prejudging them. In addition to stressing the importance of approaching the evidence without a predetermined

outcome in mind, the court told the jury in its preliminary instructions that they were the sole judges of the evidence and that they should not take anything the court said or did as indicating its beliefs regarding the evidence or what the verdict should be. Cf. United States v. Wilkinson, 124 F.3d 971, 977 (8th Cir. 1997) (jury instructions stating that questions from judge were not evidence diminish potential for prejudice). The district court's instructions were sufficient to cure any potential prejudice from its statement. It was not an abuse of discretion for the trial judge to deny Bordeaux's motion for a mistrial.

## III.

Bordeaux next argues that the district court erred in denying his motion for judgment of acquittal based on insufficiency of the evidence. We review the district court's decision to deny the motion for judgment of acquittal de novo. See United States v. Thomas, 565 F.3d 438, 441 (8th Cir. 2009). "When reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict rendered and accept all reasonable inferences which tend to support the jury verdict." United States v. Ramirez, 362 F.3d 521, 524 (8th Cir. 2004) (citation omitted). We will reverse only if no reasonable jury could have found Bordeaux guilty beyond a reasonable doubt. See id. "Evidence supporting conviction 'need not preclude every outcome other than guilty.'" United States v. Pierson, 544 F.3d 933, 938 (8th Cir. 2008) (quoting Ramirez, 362 F.3d at 524), cert. denied, 129 S.Ct. 2431 (2009). In order to sustain Bordeaux's conviction on Counts II-V, we must find sufficient evidence of all of the elements of assault with a dangerous weapon: "[that] the defendant (1) assaulted the victim, (2) used a dangerous weapon, (3) acted with the intent to do bodily harm, (4) acted without just cause or excuse, (5) is an Indian,

and (6) the offense occurred in Indian Country."[2]  United States v. Youngman, 481 F.3d 1015, 1020 (8th Cir. 2007) (citing 18 U.S.C. §§ 113(a)(3), 1153).

Bordeaux argues that because he was found not guilty of assaulting Saupitty (Count I), the jury must have credited his self-defense claim and found that he lacked the specific intent to cause bodily harm.  Thus, he argues there was insufficient evidence that he formed the specific intent to cause bodily harm to the passengers that was necessary to support the convictions on Counts II-V.  Bordeaux erroneously collapses the distinct elements of intent and lack of justification, arguing that the jury found he had the "intent . . . of self defense."

The government presented sufficient evidence to prove that Bordeaux intended to do bodily harm to the passengers.  Bordeaux claims that he shot all ten rounds "from the hip" and that he aimed low on the car and, therefore, the evidence proved that he did not intend bodily harm to the passengers.  However, the jury was not required to accept Bordeaux's statement of his intent and was instructed that intent can be inferred from the probable consequences of acts knowingly done or knowingly omitted.  See United States v. Harrison, 133 F.3d 1084, 1086 (8th Cir. 1998) (approving similar jury instruction).  Bordeaux admitted to shooting ten rounds at the vehicle carrying Saupitty and his passengers.  At trial, Luke Burning Breast testified that he saw Bordeaux shooting at the vehicle and saw the back windshield of the car shatter.  Agent Oscar Ramirez testified that there were two impact points to the back windshield.  From the location of those shots, the jury could have concluded that Bordeaux intended to cause bodily injury to the passengers.  Further, the jury may have inferred the required specific intent even from shots that hit low on the vehicle. Agent Ramirez testified regarding bullet fragments found in the passenger compartment and damage to the interior of the car.  A reasonable jury could have

_____

[2]Bordeaux stipulated to elements (5) and (6) at trial and does not challenge proof of elements (1) or (2) on appeal.

concluded from these facts that Bordeaux intended to do bodily injury to the passengers.

The government also presented sufficient evidence that Bordeaux acted without just cause or excuse when he assaulted the passengers. Bordeaux's argument is premised on the assumption that all ten shots he fired are indivisible as a single act of self-defense. However, the very requirement that self-defense be reasonable permits a jury to distinguish between one shot and the next.[3] "Force used after the danger has ceased to exist cannot be justified on the basis of reasonable belief." United States v. Thomas, 946 F.2d 73, 77 (8th Cir. 1991) (approving this language in jury instruction) (quotations omitted). Bordeaux himself characterized the last three or four shots as "warning shots." Cf. id. at 74 (shots fired as assailants were leaving). In addition to the two shots to the back windshield, Agent Ramirez also testified about a bullet hole near the gas tank, and two in the driver's side rear taillight. The additional shots after the danger to Bordeaux was attenuated distinguishes Saupitty's passengers from the bystanders in the cases cited by Bordeaux. See, e.g., Commonwealth v. Fowlin, 710 A.2d 1130, 1131, 1134 (Penn. 1998) (bystander struck while defendant was acting under reasonable belief that self-defense was necessary).

While the jury was free to credit Bordeaux's testimony and find that he lacked the requisite intent because he intended only to hit the car or that he was justified in taking all ten shots in self-defense, it was not constrained to reach that result. Nor is the jury's verdict logically inconsistent. Viewing the facts in the light most favorable to the verdict, Bordeaux continued to shoot at the vehicle and its passengers after reasonable fear of imminent harm had passed, firing at least three shots into the side of the car and four shots into the back of the car as it drove away and intending to

---

[3]The weapon used was a semi-automatic rifle, meaning that each pull of the trigger fired only one round of ammunition.

-8-

cause bodily harm to the passengers. We conclude that there was sufficient evidence to support his conviction on Counts II-V.

Since we find that there was sufficient evidence to support his conviction on Counts II-V, Bordeaux's sufficiency argument on Count VI also fails. Count VI alleges that Bordeaux knowingly discharged a firearm during and in relation to a crime of violence. Bordeaux argues that since he acted in self-defense, he did not commit a crime of violence and therefore could not be convicted of Count VI. Because we affirm the jury's verdict on Counts II-V, we also conclude that there was sufficient evidence to support Count VI. The district court did not err in denying Bordeaux's motion for judgment of acquittal on Counts II-VI.

B.

Bordeaux appeals the district court's denial of his motion for a new trial. "Upon the defendant's motion, the [district] court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. In evaluating a motion for a new trial, the district court may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." United States v. Starr, 533 F.3d 985, 999 (8th Cir.) (quoting United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002)), cert. denied, 129 S.Ct. 746 (2008). "A district court may grant a new trial under Rule 33 only if the evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred." Id. (internal quotation omitted). We review the district court's decision to deny a motion for a new trial for abuse of discretion. See id.

Bordeaux argues that, because the district court did not directly address the standard for granting a Rule 33 motion for a new trial, the court's decision was an abuse of discretion. The district court, however, identified both the motion for judgment of acquittal and motion for a new trial in its heading. Although the district

court denied the motion for a new trial sub silentio, we are persuaded that the ruling was not an abuse of discretion. Both motions were based on the same argument, that a reasonable and objective jury could not have found that Bordeaux had the specific intent to harm the passengers after finding that he did not have the specific intent to harm Saupitty. The district court rejected this argument, as we have. Further, the district court found that "putting ten unaimed slugs into a crowded vehicle" permitted a finding of intent, and Bordeaux did not dispute this critical fact. Additionally, it was undisputed that Bordeaux continued to fire after the vehicle had passed. We conclude that the evidence does not weigh heavily against the verdict, see Starr, 533 F.3d at 999, and Bordeaux has not shown that a miscarriage of justice occurred. Thus, the district court did not abuse its discretion in denying Bordeaux's motion for a new trial.

IV.

Bordeaux contends that the district court erred in not permitting him to introduce evidence of prior bad acts of Saupitty and R.F. under Federal Rules of Evidence 404(b) and 405(b). The general rule is that prior acts testimony is "not admissible to prove a victim acted in conformity with his character under Rule 405(b)." United States v. Gregg, 451 F.3d 930, 935 (8th Cir. 2006). However, evidence of prior bad acts of the victim are admissible under Rule 404(b) to establish the defendant's state of mind and the reasonableness of the defendant's use of force. See id. ("state of mind," "subjective fear of imminent grave injury"). Reputation or opinion testimony regarding the victim's character is also admissible under Rules 404(a)(2) and 405(a), since it is pertinent in a self-defense claim to show that the victim may have been the aggressor. See United States v. Taken Alive, 262 F.3d 711, 712, 714 (8th Cir. 2001) ("When a defendant raises a self-defense claim, reputation evidence of the victim's violent character is relevant to show the victim as the proposed aggressor."). We review the district court's evidentiary rulings for abuse of discretion. See Gregg, 451 F.3d at 933. "[We] will reverse only when an improper evidentiary ruling affects the substantial rights of the defendant or when we believe

that the error has had more than a slight influence on the verdict." Id. (internal citations omitted).

Bordeaux summarizes twelve incidents in his brief that he claims should have been admitted by the district court. As far as this court can determine,[4] the excluded evidence that Bordeaux claims should have been admitted regards incidents where Saupitty and/or R.F. were involved in confrontations with others in the community, threatened others in the community, discussed and owned firearms, and used and sold narcotics. Bordeaux's proffer does not suggest that he had personal knowledge or was made aware of these facts prior to the shooting. Contrary to Bordeaux's contention, these incidents, of which Bordeaux had no knowledge and which were remote in time from the incident, do not "relate[] to an integral part of the immediate context of the crime charged." United States v. LeCompte, 108 F.3d 948, 952 (8th Cir. 1997) (evidence admissible if it "explains the circumstances" or "tends logically to prove any element of the crime charged"). Prior acts cannot provide insight into Bordeaux's "intense fear" of Saupitty and R.F. if Bordeaux himself was unaware of the acts. See id.

The district court did permit Bordeaux to testify about numerous prior acts and threats made by Saupitty of which Bordeaux was aware before the shooting. Bordeaux testified that he was aware that Saupitty had previously run over someone else with a car and that Saupitty had swerved at another person with his car. He also

---

[4]Not all of the proffered testimony listed in Bordeaux's brief was actually excluded by the district court. Witnesses testified about a number of these incidents. For instance, Bordeaux complains that he was not permitted to bring in Carmen Tobacco's testimony that Saupitty hit Tobacco's child with a car. However, Bordeaux himself testified that he was aware that Saupitty "ran [sic] somebody over before." Bordeaux also complains that Doug Arcoren was not permitted to testify about Saupitty stating that he would "bust out [the Bordeauxs'] windows" and "bust up Bordeaux, and would shoot him if he had a chance." Arcoren's testimony was permitted on these subjects. See infra.

testified that he was aware that Saupitty had pulled a gun on another person and put a gun in the person's face. Additionally, he testified that he had heard that Saupitty had a gun and threatened to "do something" to Bordeaux, that Saupitty would shoot Bordeaux if he had the chance, and that Saupitty had written a rap song "indicating that he was going to kill [Bordeaux]." Finally, Bordeaux testified that he believed that Saupitty had broken the windows on his mother's car. Several times during this testimony, Bordeaux was able to affirm that these prior incidents "made [him] fearful of Saupitty causing [him] serious or deadly harm" or causing harm to his family. The district court also permitted defense witnesses to testify regarding specific acts or threats that Bordeaux was aware of prior to the shooting. For example, Luke Burning Breast testified that he told Bordeaux that Saupitty "said [he was] going to kick [Bordeaux's] ass and stuff." Doug Arcoren testified that he told Bordeaux that Saupitty threatened to "bust out [Bordeaux's] mother's windows and that if he had a chance he would bust him up or . . . beat him up . . . ."

Further, the district court properly permitted a number of defense witnesses to testify regarding Saupitty's and R.F.'s reputations for violence as permitted by Rules 404(a)(2) and 405(a). Specifically, defense witnesses testified that Saupitty has a reputation of being a "thug," "a troublemaker," "trying to be a tough guy," and of being someone who "likes to go around and cause trouble." Defense witnesses also described R.F. as having a reputation for "getting in fights[,] . . . shooting off a firearm," and being in a gang. Bordeaux argues that the district court should have also permitted testimony regarding specific acts in order to demonstrate Saupitty's and R.F.'s violent character. Rule 405(b)'s allowance for the admissibility of specific instances of conduct only applies in cases where the "character or a trait of character of a person is an essential element of a charge, claim, or defense." Fed. R. Evid. 405(b). Thus, since "a victim's violent character is not an essential element of . . . the defense of self-defense," such prior acts testimony was not admissible in this case. Gregg, 451 F.3d at 934.

The district court properly distinguished between inadmissible evidence of prior acts committed by Saupitty and R.F. that Bordeaux did not know about at the time of the shooting, and admissible evidence of acts and threats of which Bordeaux became aware prior to the shooting. See Gregg, 451 F.3d at 935 (evidence of victim's prior bad acts "is only admissible to the extent a defendant establishes knowledge of such prior violent conduct at the time of the conduct underlying the offense charged"). The district court correctly permitted Bordeaux to introduce reputation or opinion testimony pertinent to his self-defense claim. We commend the district court on its thoughtful approach to these difficult evidentiary issues, and conclude that it did not abuse its discretion. Further, in the face of the admission of significant testimony regarding Saupitty's prior acts and reputation testimony regarding Saupitty's and R.F.'s violent character, we cannot say that the exclusion of other, cumulative character evidence "had more than a slight influence on the verdict." Id. at 933.

V.

Finally, Bordeaux argues that the district court erred in not permitting him to impeach R.F. with extrinsic evidence of a prior inconsistent statement. Federal Rule of Evidence 613(b) permits use of extrinsic evidence of a prior inconsistent statement if the witness is afforded an opportunity to explain or deny the statement and the opposing party has the opportunity to cross-examine the witness on the statement. In addition to these limitations, "under 613(b) a witness may not be impeached on a collateral matter by use of prior inconsistent statements." United States v. Roulette, 75 F.3d 418, 423 (8th Cir. 1996). A matter is collateral "if the facts referred to in the statement could not be shown in evidence for any purpose independent of the contradiction." Id. We review the district court's evidentiary rulings under Rule 613(b) for an abuse of discretion. United States v. Buffalo, 358 F.3d 519, 521 (8th Cir. 2004). Further, such rulings are subject to harmless error analysis. Id. at 521-22 (citing Fed. R. Crim. Pro. 52(a)).

On cross-examination, R.F. was questioned about whether he had a fake gun or BB gun and whether he said he had pointed such a gun at Bordeaux on the night of the shooting. When R.F. denied that he had, he was questioned about a prior inconsistent statement that he had allegedly made to Nakeesha Fast Horse, which he also denied. Bordeaux proffered testimony from Fast Horse to the effect that R.F. had told her that he had a gun and pointed it at Bordeaux on the night of the shooting. The district court reasoned that whether R.F. had a BB gun was a collateral matter and excluded Fast Horse's testimony.

Bordeaux argues that R.F.'s prior inconsistent statement was a material matter because R.F.'s credibility was a key issue in the case. This misstates the test for materiality, however.[5] See United States v. Bolzer, 367 F.3d 1032, 1039 (8th Cir. 2004) ("[E]ven if Weir's credibility could constitute a material issue for purposes of Rule 613(b), the Rule 613(b) test is nonetheless not satisfied in this instance because Weir's credibility was not the subject of the prior inconsistent statement."). Whether a matter is material or collateral depends on the subject of the testimony. See id. (relevant question is "whether the *precise subject* of the prior inconsistent testimony is material") (emphasis in original) (citing Roulette, 75 F.3d at 423). Bordeaux's defense theory was not that he shot at the vehicle and its occupants because of the threat posed by R.F. In fact, Bordeaux did not testify that he saw R.F. with a gun on the night in question. Whether R.F. carried a gun, unseen by Bordeaux, "had no substantive connection whatsoever" to Bordeaux's trial. Id.; compare with Buffalo, 358 F.3d at 524, 527 (abuse of discretion to exclude extrinsic evidence of witness's prior inconsistent statement confessing to crime for which defendant was on trial). Thus, it was not an abuse of discretion for the district court to find that R.F.'s prior

---

[5]The importance of the witness is relevant to harmless error analysis, see United States v. Eagle, 498 F.3d 885, 889 (8th Cir. 2007) (considering whether witnesses were "essential to the government's case"), however, that analysis comes only after a determination that the district court abused its discretion in excluding evidence.

inconsistent statement was on a collateral matter and not admissible under Rule 613(b).

Since we find no abuse of discretion, we need not proceed to the harmless error analysis. Nevertheless, we are convinced that the district court's decision to exclude this testimony did not impact Bordeaux's substantial rights or have more than a slight influence on the verdict. See United States v. Eagle, 498 F.3d 885, 888 (8th Cir. 2007) (harmless error standard). R.F.'s testimony was not essential to the case; multiple other witnesses testified regarding the same events, and R.F.'s testimony was largely duplicative of the other passengers' testimony. See id. at 889 (corroboration by other witnesses supports conclusion of harmless error). In addition, R.F. was impeached at another point during his testimony on prior inconsistent statements about one of the key issues in this case: whether Bordeaux began to fire at the vehicle before or after Saupitty drove toward him. Thus, R.F.'s credibility had already been called into question through impeachment with extrinsic evidence of a prior inconsistent statement about a material matter.

VI.

For the foregoing reasons, we affirm Bordeaux's conviction.

_____