# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 10-2159

———————

United States of America,

           Appellee,

v.

Harold Drapeau, Jr.,

           Appellant.

\* \* \* \* \* \* \* \* \* \* \*

Appeal from the United States
District Court for the
District of South Dakota.

———————

Submitted: December 16, 2010
Filed: July 8, 2011

———————

Before WOLLMAN, BRIGHT, and COLLOTON, Circuit Judges.

———————

WOLLMAN, Circuit Judge.

Harold Drapeau, Jr., was convicted of assaulting, resisting, or impeding a federal officer resulting in bodily injury, in violation of 18 U.S.C. § 111(a)(1) and (b), and was sentenced to twenty-seven months' imprisonment and three years of supervised release. Drapeau appeals his conviction and sentence, arguing that the district court[1] erred by denying his motion for a judgment of acquittal, improperly excluding character evidence of the alleged victim, and imposing additional conditions of supervised release after sentencing. We affirm.

———————

[1]The Honorable Roberto A. Lange, United States District Court Judge for the District of South Dakota.

## I. Background

On August 23, 2009, a resident of the Crow Creek Sioux Tribe requested additional police patrol in the East Housing community in Fort Thompson, South Dakota. The resident stated that Drapeau and two other males had left her residence and that they might return and cause a disturbance. Bureau of Indian Affairs (BIA) Officer Marlin Robert Mousseau, Jr., responded to the dispatch and drove towards the East Housing community, ten minutes from his dispatch location. Mousseau's vehicle was equipped with a camera, and he wore a remote microphone on his uniform.

BIA Officer Marty Foote also heard the dispatch and stopped three individuals walking alongside a road who matched the resident's description. Foote recognized Drapeau but before he could ask him any questions, Drapeau ran to a white vehicle and drove away. Foote radioed Mousseau that he had seen Drapeau and that Drapeau had left in a white vehicle that was heading back towards East Housing. Mousseau knew where Drapeau lived in East Housing and drove to that location, where he observed three people and a vehicle that matched Foote's description in Drapeau's driveway. Mousseau pulled into the driveway, parked his BIA vehicle, and activated his vehicle's video camera, which recorded the view of the side of the house and Drapeau's backyard. The remote microphone began recording the audio of the incident. Two of the individuals went inside the residence. The third, a female, ran to the back of the residence. Mousseau pursued her, threatened to deploy his taser,[2] and ordered her to get on the ground. Mousseau handcuffed and arrested the woman for eluding, a violation of the Crow Creek Tribal Code § 10-7-10. Mousseau identified the woman as Mitzi Medicine Crow, Drapeau's wife. Mousseau observed that Medicine Crow appeared intoxicated and smelled of alcohol. While bringing her

---

[2]A taser is an electronic control device that discharges two probes on a target when its trigger is pulled. Once the two probes hit the target, the taser will send a jolt of electricity through the target.

to the BIA vehicle, Mousseau heard a child cry briefly inside the residence and asked Medicine Crow about it. She responded that her sister was watching her child.

Mousseau spent the next several minutes attempting to enter the residence by knocking on the front door and hiding in the bushes. He did not have a reason to arrest Drapeau, but wanted to speak with him and to check on the child. Mousseau noticed an open window next to the front door. Looking inside the window, he could see Drapeau's mother, Theresa Grassrope, holding the child with her hand over its mouth and whispering in its ear. Mousseau also saw an individual hidden in the curtains, whom he later identified as Drapeau. Because the curtain obstructed his view, Mousseau did not know if Drapeau was armed. Mousseau ordered Grassrope to open the front door and told Drapeau that if he did not move away from the curtain he would be tasered. In an effort to inveigle Grassrope and Drapeau into coming out of the residence, Mousseau told them that he had Medicine Crow in his car and that she had been arrested "for no reason." After Drapeau and Grassrope failed to come out or open the door, Mousseau threatened to arrest Grassrope for obstruction if she did not open the front door. She replied that she could not do so because it was not her home. Mousseau responded that if Grassrope did not open the door, he would crawl through the window and she would go to jail.

After Mousseau failed to gain entrance through the front door, he broke the screen off the front window. As Mousseau put his right arm through the window, Drapeau pressed the window downward against Mousseau's arm, injuring it. Using his left arm, Mousseau pushed the window up and released his right arm. He then deployed his taser into the home. Drapeau ceased pressing down on the window and ran towards the back of the home.

Mousseau ran around outside to the backyard, where he met Drapeau exiting through the back door. Mousseau arrested Drapeau, placed him in the BIA vehicle, and then entered through the back door to arrest Grassrope, who had locked herself

-3-

and the child in a bathroom. Mousseau demanded she come out, stating "I'm gonna make true with my promise" and that "all [Grassrope] had to do [to avoid going to jail] was open the door." Grassrope came out and Mousseau arrested her as well. Mousseau then left the child with Medicine Crow's sister, Maria, who had been babysitting the child.

Drapeau was indicted for assaulting, resisting, or impeding a federal officer resulting in bodily injury, in violation of 18 U.S.C. § 111(a)(1) and (b). He pleaded not guilty and requested a jury trial. Drapeau sought to present evidence of Mousseau's character pursuant to Federal Rule of Evidence 404(a)(2) by filing a pretrial notice and during the pretrial conference. The evidence consisted of seven tribal resolutions and an unsigned memo to United States Senator John Thune. The first resolution was written by the Nebraska Winnebago Tribe in 2005, describing Mousseau's misconduct and requesting his permanent removal as a police officer from the Winnebago Law Enforcement Services Department. Thereafter, Mousseau transferred to the Crow Creek BIA duty station, whereupon the Crow Creek Sioux Tribal Council adopted the other six resolutions and memo in response to numerous complaints against Mousseau and requested his removal from the Crow Creek Sioux Indian Reservation. In the memo to Senator Thune, a Crow Creek Sioux Tribe civil rights group requested an internal investigation of Mousseau and the police department. During the pretrial conference, the district court preliminarily denied the 2005 Winnebago resolution based on relevancy and hearsay and the last two Crow Creek resolutions because they postdated the incident, and stated that the remaining four resolutions might become admissible if Drapeau testified that he was aware of them.

Drapeau sought to use the character evidence to prove his intent to defend himself and his family and to prove his state of mind. He asserted that the evidence would demonstrate Mousseau's reputation for violence, aggressiveness, and excessive use of his taser. Drapeau also sought to inquire of character witnesses as to

Mousseau's reputation in the community. During the pretrial conference, the government objected to the evidence, arguing that the resolutions and reputation testimony were irrelevant to demonstrate Drapeau's state of mind unless he was aware of them before the incident. Drapeau responded that the offered evidence did not constitute Rule 404(b) evidence, but instead was admissible pursuant to Rule 404(a)(2). The district court preliminarily denied Drapeau's motion to present the tribal resolutions and reputation testimony evidence.

After the government presented its case, the district court held a hearing outside the presence of the jury. Drapeau moved for a judgment of acquittal on the grounds that Mousseau was not acting within his official capacity and that Drapeau was acting reasonably in self-defense. The district court denied his motion.

Following the denial of the motion, Drapeau made an offer of proof of the tribal resolutions and urged their admission as character evidence pursuant to Rule 404(a)(2). Drapeau also proffered four character witnesses who would have testified as to Mousseau's reputation for violence and unlawfulness. The district court excluded the proffered evidence and reiterated its view that the character evidence was inadmissible because Drapeau had not offered any evidence regarding his awareness of the resolutions or Mousseau's reputation. The district court also ruled that the 2005 Winnebago tribe resolution was inadmissible on the grounds of relevancy, hearsay, and remoteness in time from the events giving rise to the charges against Drapeau.

Following the proffers, Medicine Crow testified that before the incident she and Drapeau were aware of Mousseau's reputation for being "mean, short-tempered," and untruthful, including a willingness to make "up stories to cover his wrongs." She also testified that they were unaware of the tribal resolutions until after the incident. After her testimony, the district court renewed its exclusion of the resolutions and memo but reversed its preliminary denial of Drapeau's reputation witnesses, stating that Drapeau

could call whatever witnesses he wished. The district court then recalled the jury. Drapeau rested without presenting any evidence, and the jury found him guilty.

As indicated earlier, the district court sentenced Drapeau to twenty-seven months' imprisonment and three years of supervised release and announced the conditions of the supervised release. Two days after the sentence was imposed, the district court issued a written order containing the supervised release conditions.

## II. Discussion

### A. Judgment of Acquittal

Drapeau argues that the district court erred in denying his motion for a judgment of acquittal. He asserts that the evidence was insufficient to prove that Mousseau was performing his official duties at the time of the alleged assault and that Drapeau was not acting in self-defense.[3] He asserts that he had a right to close and secure the window in an effort to defend against an unlawful, forcible, and warrantless entry into his home. We review *de novo* a district court's denial of a motion for a judgment of acquittal. See United States v. Dinwiddie, 618 F.3d 821, 832 (8th Cir. 2010) (citing United States v. Hodge, 594 F.3d 614, 617 (8th Cir. 2010)). "We will affirm if the record, viewed most favorably to the government, contains substantial evidence that supports the jury's verdict." Id. "Substantial evidence is evidence sufficient to prove all the elements of the offense beyond a reasonable doubt." Id.

The government was required to prove that: (1) Drapeau forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered a federal officer employed as

---

[3]Drapeau also argues that Mousseau was unauthorized to enforce tribal law because of the 2006 tribal resolution that requested Mousseau's removal from the Crow Creek Sioux Reservation. Because Drapeau failed to challenge Mousseau's status as a federal officer during the trial, we consider this issue waived on appeal.

a police officer by the Bureau of Indian Affairs; (2) the alleged offense was committed voluntarily and intentionally; (3) the alleged offense resulted in bodily injury to Mousseau; (4) at the time of the alleged offense, the officer was doing what he was employed by the federal government to do and not deviating from the employer's business for personal reasons; and (5) that Drapeau was not acting in self-defense. Drapeau does not challenge the sufficiency of the evidence with respect to the first three elements.

1. Performance of Official Duties

Drapeau contends that Mousseau acted illegally and that the assault therefore could not have occurred while Mousseau was engaged in the performance of his official duties. See 18 U.S.C. § 111. "Engaged in performance of official duties is simply acting within the scope of what the agent is employed to do." United States v. Street, 66 F.3d 969, 978 (8th Cir. 1995) (citation and internal quotation marks omitted). "The scope of what the agent is employed to do is not defined by whether the officer is abiding by laws and regulations in effect at the time of the incident, nor is the touchstone whether the officer is performing a function covered by his job description." Id. (citation and internal quotation marks omitted). Thus, the test is whether the officer is acting within the scope of his employment, that is, whether the officer's actions fall within his agency's overall mission, in contrast to engaging in a personal frolic of his own. Id.

Whether Mousseau was a federal officer within the meaning of § 111 was a question of law for the court. See United States v. Oakie, 12 F.3d 1436, 1440 (8th Cir. 1993). Whether Mousseau was acting as a federal officer and whether he was performing federal "investigative, inspection, or law enforcement functions" at the time of the assault or acting outside the scope of his employment, were fact questions for the jury. Id. (citations omitted); see United States v. Lopez, 710 F.2d 1071, 1074 (D.C. Cir. 1997). Compare United States v. Clemons, 32 F.3d 1504, 1507-08 (11th

Cir. 1994) (listing examples of officers found to be acting within the scope of their employment, including FBI agent assaulted while walking to report for work, DEA agent assaulted after being on-duty and still on-call in government-owned vehicle, IRS agent assaulted during course of repossessing vehicle, off-duty agent shot while attempting to stop robbery), with United States v. Marquez, 858 F. Supp. 8, 10 (D.P.R. 1994) (holding FBI agent assaulted after visiting automated teller machine was not engaged in performance of his official duties because he was not coming to or returning from work, not in uniform, not using a government-owned vehicle, and did not indicate that he was performing his official duties).  The courts have adopted an interpretation of the phrase "engaged in the performance of official duties" that is "broad enough to fulfill Congress's goals of protecting federal officers and facilitating the accomplishment of federal functions."  Street, 66 F.3d at 978 (quoting United States v. Green, 927 F.2d 1005, 1007 (7th Cir. 1991)).

There was substantial evidence that Mousseau was engaged in the performance of his official duties.  The government presented evidence that Mousseau had been a BIA officer since 2002 and was on duty as a BIA officer August 23, 2008.  In the early morning hours of August 23, 2008, Mousseau was dispatched to address an incident involving Drapeau, who had shortly before run away from an officer and was headed towards his home.  Mousseau testified that at the time of the incident he had concerns for a child's welfare and his own safety because of the individual hidden behind a curtain.  Thus, the evidence was sufficient to support the jury's finding that Mousseau was engaged in the performance of his duties as a federal officer at the time of the assault and not in a personal frolic.

## 2. Self-Defense

Drapeau asserts that the government failed to prove that he was not acting in self-defense. He contends that the Fourth Amendment protects individuals from unreasonable governmental intrusion into their homes and that his pushing downwards on the window was thus justified. Drapeau asserts that Mousseau acted outside the scope of his official duties by attempting to unlawfully enter the home through the window and threatening to deploy the taser.

An individual is not justified in using force for the purpose of resisting arrest or other performance of duty by a law enforcement officer within the scope of his official duties. See United States v. Schmidt, 403 F.3d 1009, 1016 (8th Cir. 2005) (citing United States v. Dawdy, 46 F.3d 1427, 1430-31 (8th Cir. 1995)) ("In our circuit, resistance to an illegal arrest can furnish grounds for a second, legitimate arrest."). But an individual may be justified in using force to resist excessive force used by a law enforcement officer. See, e.g., United States v. Taken Alive, 262 F.3d 711, 714 (8th Cir. 2001). Because there was substantial evidence to support the jury's determination that Mousseau was acting within the scope of his official duties, the issue becomes whether Mousseau used excessive force when attempting to enter Drapeau's home such that Drapeau was justified in pushing down on the window.

Excessive force is force that was unreasonable or unnecessary under the circumstances, *i.e.*, greater than the amount of force that was objectively reasonable. See Shannon v. Koehler, 616 F.3d 855, 862 (8th Cir. 2010). "The reasonableness of a particular use of force depends on the circumstances of each case, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id. (quoting Wertish v. Krueger, 433 F.3d 1062, 1066 (8th Cir. 2006)).

There was substantial evidence that Mousseau did not use excessive force. Drapeau had fled from an officer earlier that night before the officer was able to question him. Although Mousseau testified that there were no exigent circumstances requiring his immediate admission into the home, he also testified that he had concerns about the welfare of a child and his personal safety. Mousseau had attempted to gain access to the home for several minutes by knocking on the door, concealing himself in the yard, and speaking through the open window. The jury heard the audio recording, which revealed that Mousseau threatened to deploy his taser into the home if he was not admitted. A reasonable jury could conclude that Mousseau did not use excessive force in performing his official duties and that Drapeau did not act in self-defense when he closed the window on Mousseau's arm. Accordingly, the district court did not err in denying the motion for a judgment of acquittal.

## B. Character Evidence

Drapeau contends that the district court improperly excluded the proposed evidence of Mousseau's reputation for aggression and unlawfulness. "We review the evidentiary rulings of a district court only for abuses of discretion, and will reverse only when an improper evidentiary ruling affects the substantial rights of the defendant or when we believe that the error has had more than a slight influence on the verdict." United States v. Gregg, 451 F.3d 930, 933 (8th Cir. 2006) (citations omitted). "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion," except in criminal cases when it is "evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused." Fed. R. Evid. 404(a)(2). "When a defendant raises a self-defense claim, reputation evidence of the victim's violent character is relevant to show the victim as the proposed aggressor." See Taken Alive, 262 F.3d at 714. "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by

testimony in the form of an opinion." Fed. R. Evid. 405(a); see Gregg, 451 F.3d at 934.

Drapeau now asserts on appeal that he offered the tribal resolutions and memo to demonstrate that Mousseau was the first aggressor. In Drapeau's pretrial notice of intent to present evidence and during the pretrial conference, he cited Rule 404(a)(2) but stated that he was offering the tribal resolutions and memo for the purpose of proving his state of mind, which is not one of the purposes encompassed within Rule 404(a)(2). See United States v. Keiser, 57 F.3d 847, 854 (9th Cir. 1995). Assuming for the purposes of argument that Drapeau in fact presented the tribal resolutions and memo for the purpose of showing Mousseau was the first aggressor, his failure to present evidence of his prior awareness would not have been grounds for excluding that evidence. See id. at 854 ("Thus, whether the defendant knew of the victim's character at the time of the crime has no bearing on whether victim character evidence should come in under [Rule] 404(a)(2)."). The evidence would still have been inadmissible under Rules 404(a)(2) and 405(a), however, because it was not in the proper form of witness testimony. Accordingly, any error in requiring evidence of Drapeau's pre-incident knowledge would not have affected Drapeau's substantial rights because the tribal resolutions and memo would have been excludable pursuant to Rule 405(a).

In light of Drapeau's stated purpose, it was understandable why the district court was under the impression that Drapeau was actually seeking to present the evidence pursuant to Rule 404(b)[4], not Rule 404(a)(2) as he had recited. The fact that

---

[4]Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . .

-11-

the tribal resolutions and memo were not in the form of witness testimony would not have prevented Drapeau from offering the evidence under Rule 404(b). See Fed. R. Evid. 405(b) ("In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's character."). But, as the district court stated, Drapeau would have been required to present evidence that he had pre-incident knowledge of the evidence. See Gregg, 451 F.3d at 935; United States v. Bordeaux, 570 F.3d 1041, 1049 (8th Cir. 2009) ("[E]vidence of prior bad acts of the victim are admissible under Rule 404(b) to establish the defendant's state of mind and the reasonableness of the defendant's use of force." (citing Gregg, 451 F.3d at 935)); United States v. Scout, 112 F.3d 955, 962 n.7 (8th Cir. 1997) ("[The defendant] testified that he did not know the identity of the police officers pursuing him. Because [the officer's] alleged reputation for violence could therefore not have affected [the defendant's] state of mind when assaulting [the officer], [the officer's] reputation—and how it was derived—was irrelevant."). During the pretrial conference, Drapeau's counsel told the district court that Drapeau had pre-incident knowledge of Mousseau's reputation and the tribal resolutions. However, during the hearing outside the presence of the jury, Medicine Crow testified that Drapeau had not known of the resolutions before the incident. Drapeau failed to present any evidence to the contrary, and he does not pursue this theory on appeal. Accordingly, we need not further address whether the district court erred in excluding the tribal resolutions and memo under Rule 404(b).

## C. Supervised Release Conditions

Drapeau contends that the additional supervised release conditions imposed by the district court violated the Double Jeopardy Clause. U.S. Const. amend. V. "We review the district court's imposition of the terms and conditions of supervised release for an abuse of discretion." United States v. Durham, 618 F.3d 921, 933 (8th Cir. 2010). An oral pronouncement of a sentence "prevails over a contrary judgment

-12-

which may be entered." United States v. Raftis, 427 F.2d 1145, 1146 (8th Cir. 1970) (citations omitted).

Drapeau contends that the district court improperly added two new mandatory conditions and thirteen new discretionary conditions to his supervised release terms. Drapeau contends that the district court failed to state at the sentencing hearing that he would be subject to the mandatory condition requiring his cooperation in the collection of his DNA. This is incorrect. At the sentencing hearing the district court specifically stated "The defendant shall cooperate in the collection of DNA, pursuant to 18 United States Code §§ 3563(a)(9) and 3583(d)." Drapeau's argument on this condition thus fails.

Drapeau argues that the district court also erred in adding to the written judgment the statutory condition that he "shall submit to one drug test within fifteen days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the court [pursuant to 18 U.S.C. §§ 3563(a)(5) and 3583(d) and U.S. Sentencing Guidelines § 5D1.3(a)(4)]." In United States v. Vega-Ortiz, 425 F.3d 20, 22 (1st Cir. 2005), the defendant appealed the imposition of the same drug testing requirement after the district court had failed to notify the defendant during the sentencing hearing that he was subject to the condition. The district court had only told the defendant that the standard conditions of the U.S. Sentencing Guidelines applied. Id. at 23. The Court of Appeals for the First Circuit reasoned that the defendant was on constructive notice that the mandatory condition of 18 U.S.C. § 3583(d) and U.S. Sentencing Guidelines § 5D1.3(a)(4) would apply even if the district court had not explicitly stated this condition at the sentencing hearing. Id.; see United States v. Sepúlveda-Contreras, 466 F.3d 166, 169 (1st Cir. 2006) ("Defendants are deemed to be on constructive notice for mandatory and standard conditions announced for the first time in a written judgment, and therefore have no right-to-be-present claim with respect to any such condition." (citations omitted)). Similarly, the district court in this case ordered Drapeau to comply with the standard

-13-

conditions that it had adopted, thus he was on constructive notice of the mandatory statutory condition. See United States v. Napier, 463 F.3d 1040, 1043 (9th Cir. 2006) ("For that reason, imposition of these mandatory and standard conditions is deemed to be implicit in an oral sentence imposing supervised release. When those standard conditions are later set forth in a written judgment, the defendant has no reason to complain that he was not present at this part of his sentencing because his oral sentence necessarily included the standard conditions." (citation omitted)); United States v. Truscello, 168 F.3d 61, 63-64 (2d Cir. 1999) ("Our view is buttressed by the fact that we previously have concluded that, at oral sentencing, even the most general allusion to the 'standard conditions' of supervised release is a sufficient basis on which to predicate the imposition of each of the conditions normally regarded as standard." (citation omitted)).  Drapeau also had notice of the drug testing because of the district court's other stated conditions.

At the sentencing hearing, the district court attempted to order Drapeau to submit to drug testing as noted in the written judgment, however, it apparently inadvertently said that the testing was required within fifteen days of the date of "sentencing," not "release from imprisonment."  The record is clear that the district court attempted to recite the mandatory, standard, and special conditions of supervised release as outlined in U.S. Sentencing Guidelines § 5D1.3.  Section 5D1.3(a)(4) and 18 U.S.C. §§ 3563(a)(5) and 3583(d) require that a district court judge articulate why it would choose to suspend the drug testing requirement.  The district court did not articulate why the drug testing requirement would be suspended, but mistakenly replaced the phrase "release from imprisonment" with the word "sentencing."

Drapeau's responsibility to submit to drug testing was also required by one of his special conditions that was recited during sentencing.  It provided that "The defendant shall submit a sample of his blood, breath, or urine at the discretion and upon the request of the probation officer."  We conclude that the written mandatory drug testing condition is consistent with the oral pronouncement.  The district court

did not abuse its discretion by including the mandatory condition in the written judgment.

Finally, Drapeau contends that the district court erred in adding thirteen discretionary conditions to his supervised release. Drapeau failed to object during sentencing to the district court's requirement that Drapeau "shall comply with the standard conditions that have been adopted by this court." Thus, we review only for plain error. See United States v. Simons, 614 F.3d 475, 478 (8th Cir. 2010). "Plain error occurs if the district court deviates from a legal rule, the error is clear under current law, and the error affects the defendant's substantial rights." Id. at 479 (quoting United States v. Crose, 284 F.3d 911, 912 (8th Cir. 2002)). The error must also "seriously affect the fairness, integrity or public reputation of judicial proceedings." Id. (citations omitted). As stated above, a number of circuits have held that a district court may refer generally to the standard conditions of the U.S. Sentencing Guidelines in § 5D1.3 and is not required to manually recite each mandatory and standard condition of supervised release. See, e.g., United States v. Little Bear, No. 10-1782, 2011 WL 668115, at *2 (8th Cir. Feb. 25, 2011) (unpublished); Napier, 463 F.3d at 1043; Vega-Ortiz, 425 F.3d at 22; United States v. Vega, 332 F.3d 849, 853 n.8 (5th Cir. 2003) ("Although we require special conditions like drug treatment to be included in the oral pronouncement of sentence, 'explicit reference to each and every standard condition of supervision is not essential to the defendant's right to be present at sentencing.' This difference in law reflects the distinction between the general applicability of the standard (and mandatory) conditions and the discretionary applicability of the special ones." (citations omitted)); Truscello, 168 F.3d at 63-64.

The district court stated that the court's standard conditions applied to Drapeau. In the written judgment, it enumerated the 18 U.S.C. § 3563(c)(1)-(13) standard conditions. The district court followed the U.S. Sentencing Guidelines by imposing the standard conditions because they are "recommended for supervised release." As

stated above, mechanical reference by the district court judge to each standard condition is not required. Drapeau was aware that the district court had stated that the standard conditions would apply and thus had the opportunity to ask the district court to specify which § 3563(c) standard conditions would be applied. He failed to do so. We conclude that there was no plain error and that the district court followed the § 3563(c) recommended standard conditions.

## III.  Conclusion

Accordingly, we affirm Drapeau's conviction and his sentence.[5]

BRIGHT, concurring in part and dissenting in part.

I agree with the majority that sufficient evidence supports the convictions and that the district court did not err in imposing supervised release conditions. I also agree that the district court did not err in excluding from evidence the tribal resolutions and memorandum to Senator John Thune. But I disagree that the district court did not err in excluding evidence of Officer Mousseau's reputation.

The government claims that Drapeau could have introduced other witnesses who would "testify regarding their knowledge of Officer Mousseau's reputation in the community for aggression or violence." Indeed, Drapeau attempted to call such witnesses, but the district court refused to allow these witnesses to testify. The record reflects that he attempted to do so not once, but twice.

Before trial, Drapeau moved in limine to admit the tribal resolutions and memorandum to Senator Thune. During the pre-trial discussion of this motion, the government asserted that only Drapeau should be permitted to testify about Officer

---

[5]Appellee's motion to expand the record is denied.

Mousseau's reputation. The government stated that it "[did] not believe that anybody else can take the stand and say that [Officer Mousseau] had a reputation in the community for having a violent nature." Trial Tr. 14. Drapeau responded that he "had the chairman of the Winnebago Tribe, John Black Hawk, ready to come up here and testify as to the problems that they had with him there, in general, his character traits which led him to . . . be forced out of that community." Trial Tr. 16-17. The district court stated that it would view "the information from others about Officer Mousseau . . . very skeptically." Trial Tr. 18.

Drapeau then asked the district court to clarify its ruling on whether witnesses could testify as to Officer Mousseau's reputation. Drapeau stated,

> I do have a question regarding the character of the -- the alleged victim in this case with respect to the witnesses that take the stand . . . in terms of what was – "Please describe for me his reputation in the community as an officer, pertaining to the way that he conducted business." I think that's admissible, and I would ask for a ruling on that particular issue.

Trial Tr. 21. The government responded:

> As it relates to these other witnesses, I don't care if they are my witnesses or the defense witnesses; their knowledge of [Officer Mousseau's] reputation in the community is irrelevant. The only person whose knowledge is relevant is the defendant's.
>
> And I cite to [*United States v. Bordeaux*, 570 F.3d 1041 (8th Cir. 2009)] . . . . That case specifically indicates that the only person's knowledge -- you know, he -- he can't claim a reputation gave him a right to defend himself if he wasn't aware of that reputation."

Trial. Tr. 22. The district court then ruled,

Right. The <u>Bordeaux</u> case is instructive. And, [prosecutor], the Court agrees with you: As to the reputation of Officer Mousseau for anything other than truthfulness in his community, his reputation as a police officer, the only -- given that self-defense appears to be the defense, the only person who -- whose knowledge is pertinent on that subject and on Officer Mousseau and his reputation is Mr. Drapeau's. So no other witness is going to be giving that sort of testimony.

Trial Tr. 22-23.

After the government finished its case-in-chief, Drapeau again attempted to have other witnesses testify as to Officer Mousseau's reputation. Drapeau subpoenaed a number of people who would testify about Officer Mousseau's character traits, including brutality, violence, and harassment. Trial Tr. 117. The government responded to Drapeau's argument, "[U]nder <u>Bordeaux</u>, I think that's inadmissible. The only person whose knowledge is relevant is the defendant's." Trial Tr. 120. The district court agreed with the government, stating "[T]he Court does view the evidence that way, as I said this morning." *Id*.

This was error.

Federal Rule of Evidence 404(a)(2) provides that evidence of a person's character is not admissible for proving action in conformity therewith except:

In a criminal case . . . evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor.

Fed. R. Evid. 404(a)(2). Under this Rule, the district court should have permitted Drapeau to call his reputation witnesses.

This court has previously held that a defendant may introduce testimony from other witnesses as to the victim's alleged reputation in the community. For example, in *United States v. Taken Alive*, the government charged *Taken Alive* with assaulting a police officer. 262 F.3d 711, 711 (8th Cir. 2001). *Taken Alive* sought to introduce testimony from two witnesses addressing the officer's "aggressiveness, quarrelsomeness, and violence in the performance of his duties as an officer." *Id*. at 714. The district court prohibited the witnesses from testifying. *Id*. We reversed the district court, holding that "[w]hen a defendant raises a self-defense claim, reputation evidence of the victim's violent character is relevant to show the victim as the proposed aggressor." *Id*. We explained that "[a] victim's use of unlawful force may justify the defendant's reciprocal use of force." *Id*. (citing *United States v. Keiser*, 57 F.3d 847, 854 (9th Cir. 1995)).

Moreover, the district court erred in its reliance on *Bordeaux*. There, this court held that the defendant was entitled to introduce reputation or opinion testimony pertinent to his self-defense claim. *Bordeaux*, 570 F.3d at 1050. In that assault case, we held that "the district court properly permitted a number of defense witnesses to testify regarding [the victim's] reputation[] for violence." *Id*. Accordingly, *Bordeaux* does not stand for what the district court believed – that Drapeau could not call witnesses to testify as to Officer Mousseau's reputation.

Here, the district court reasoned that the evidence was inadmissible because Drapeau did not establish that he knew of Officer Mousseau's reputation at the time of the assault. But such knowledge is not required. As explained in the Federal Rules of Evidence Manual, § 404.02[2], at 404-10 (9th ed. 2006):

> [Rule 404(a)(2)] permits the accused to introduce evidence of a pertinent character trait of the victim of a crime. The most common example is in a self-defense case. Under the Rule, the defendant is permitted to introduce evidence of the victim's character for aggressiveness (subject to the limitations on form provided by Rule 405), to create the inference

that the victim acted in accordance with that character trait on the occasion in question. Admissibility is not dependent on the defendant's prior awareness of the victim's character trait; the evidence is admissible to show how the victim acted.

*See also Keiser*, 57 F.3d at 855 (reviewing federal cases and concluding that "[t]hese cases suggest a common understanding in the federal courts that 'personal knowledge' of the victim's propensity for violence is simply not a prerequisite for admission of victim character evidence under Rule 404(a)(2)"); *United States v. Burks*, 470 F.2d 432, 437 (D.C. Cir. 1972) ("[E]vidence of the deceased's violent character is relevant and admissible even though unknown to the defendant."). The district court erred in requiring that Drapeau establish his knowledge of Officer Mousseau's reputation and in prohibiting other witnesses from testifying as such.

Although Drapeau objected on several occasions to the district court's ruling, he did not specifically raise this issue on appeal. But this failure does not necessarily preclude review of the district court's error. *See Silber v. United States*, 370 U.S. 717, 718 (1962) (reviewing an issue decided by the district court, even though it was not raised on appeal). As we have explained, this court "can examine a critical issue affecting substantial rights sua sponte in criminal cases under Federal Rule of Criminal Procedure 52(b)." *DeRoo v. United States*, 223 F.3d 919, 926 (8th Cir. 2000). Rule 52(b) provides that, "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b). Of course, "[t]his power to review issues not raised by the parties must be exercised only with great caution and its use is restricted 'to avoid a miscarriage of justice.'" *United States v. Brown*, 508 F.2d 427, 430 (8th Cir. 1974) (quoting *Johnson v. United States*, 362 F.2d 43, 46 (8th Cir. 1966)). The nature of this case and affect of the district court's error merit attention.

Drapeau's substantial rights were undoubtedly affected by the district court's erroneous decision to deny him his right to present a defense. This case boiled down

to whether Officer Mousseau acted as the aggressor in this incident and whether Drapeau reasonably defended himself and others against the officer's unlawful force. As explained, when a defendant puts forth a self-defense theory, "reputation evidence of the victim's violent character is relevant to show the victim as the proposed aggressor" and the "victim's use of unlawful force may justify the defendant's reciprocal use of force." *See Taken Alive*, 262 F.3d at 714. Drapeau had a fundamental right to present a defense, *see United States v. Turning Bear*, 357 F.3d 730, 733 (8th Cir. 2004), and the district court denied him of this right by excluding all evidence of Officer Mousseau's reputation for aggression, unlawfulness, and excessive force which should have been admitted under Fed. R. Evid. 404(a)(2).

After considering the clearly established law and the blatant error, I believe that failing to correct this error would result in a miscarriage of justice. Accordingly, I would reverse and remand for a new trial at which the district court should permit Drapeau to introduce testimony of Officer Mousseau's reputation in the community.

Finally, I conclude by expressing my extreme disbelief in the treatment Drapeau and his family members received at the hands of Officer Mousseau. His actions were deplorable, beyond reproach and should not be tolerated. Although the law should not permit Drapeau to cause Officer Mousseau physical harm, neither should it entrust Officer Mousseau with the responsibility of safeguarding the well-being of the people living on Indian reservations in South Dakota.

_____