# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-2433

_____

United States of America

*Plaintiff - Appellee*

v.

Terrance C. Jackson

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of North Dakota - Bismarck

_____

Submitted: December 15, 2016
Filed: March 27, 2017
[Published]

_____

Before KELLY and MURPHY, Circuit Judges, and MONTGOMERY,[1] District
Judge.

_____

KELLY, Circuit Judge.

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the
District of Minnesota, sitting by designation.

A jury convicted Terrance C. Jackson of second-degree murder and assault with a deadly weapon for the March 27, 2017, killing of Gerald Smith on the Fort Berthold Indian Reservation in New Town, North Dakota. The district court[2] sentenced Jackson to 480 months of imprisonment and five years of supervised release. Jackson appeals the district court's denial of his suppression motion, his motion in limine to admit evidence of Smith's violence, his request for surrebuttal argument at closing, his motion to continue sentencing, and his requests for a sentencing variance and a continuance of the sentencing hearing. We have jurisdiction pursuant to 28 U.S.C. § 1291 and, finding no reversible error, we affirm.

## I. Background

On March 27, 2014, Smith and his friend Neal Hale were on the side of the highway picking up trash. Jackson was driving in his pickup truck with his cousin when he saw Smith, and he pulled over. Hale approached the truck, and Jackson told him that Smith had pulled a gun on him a few days earlier and he just wanted to talk to him. Jackson got out of the truck, removing his hat and sunglasses, and Jackson and Smith approached one another. Smith hit Jackson in the face with his fist, causing Jackson to stagger backward. The two men then began swinging at each other with Smith making contact once more, elbowing Jackson in the body. Next, Jackson reached into his pocket and pulled out a knife, which he swung at Smith twice. The knife struck Smith in the chest on the second swing. Smith stumbled toward the roadway and collapsed as Jackson jumped into the pickup, which his cousin was now driving, and drove off. Smith died at the scene.

As they drove away, Jackson said, while sobbing, "I think I killed him." Jackson's cousin pulled over and got out of the car, and Jackson continued on to the

---

[2]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

apartment where his girlfriend was staying. When he entered, his girlfriend was lying on the couch. Jackson laid the knife he used to stab Smith on her chest, and told her he had stabbed Smith. A friend then braided and cut Jackson's long hair. As is traditional in his culture, Jackson gave the braid to his brother to give to their mother. Shortly thereafter, the police arrived at the apartment, found Jackson hiding in a closet, and arrested him.

Officers arrested Jackson pursuant to a federal warrant for violations of conditions of supervised release from a 2011 burglary conviction as well as on tribal charges. A tribal officer read Jackson his Miranda warnings and took him to the Gerald Tex Fox Justice Center (Justice Center) in New Town, North Dakota. A few hours later, several officers questioned Jackson and received consent to swab his hands. Prior to trial, Jackson moved to suppress statements he made during this questioning, which the district court denied.

Jackson pursued a self-defense theory at trial. Jackson presented evidence that his family and Smith's family had a history of violent altercations with one another. Most recently, about two days prior to the stabbing, Smith pointed a gun at Jackson while they were at Jackson's cousin's house. Prior incidents included Smith hitting Jackson's sister in the face earlier in 2014 and Smith stabbing Jackson in the torso in 2006 when the two were 15 years old. To support his self-defense claim, Jackson moved in limine to admit these prior violent acts by Smith, among many others, as well as evidence of Smith's reputation for violence. The district court permitted some evidence of Smith's prior violence at trial but excluded certain specific acts and related evidence.

A four-day jury trial commenced on December 14, 2015, at which the government called seventeen witnesses and the defense called six, including Jackson. Prior to trial and again before closing, Jackson moved to present a surrebuttal closing argument, contending that Federal Rule of Criminal Procedure 29.1, which controls

the order of closing arguments, was unconstitutional as applied to him. In each instance, the district court denied the request for surrebuttal argument. After asking a question regarding the elements of the lesser-included voluntary manslaughter charge, the jury found Jackson guilty of second-degree murder and assault with a deadly weapon.

Using the 2015 Sentencing Guidelines, the Presentence Investigation Report (PSR) determined Jackson had an offense level of 38 and a criminal history category of VI for a sentencing range of 360 months to life. Jackson's criminal history category was raised from V to VI because he was designated a career offender due to convictions for burglary and aggravated domestic assault. Even without career offender status, Jackson's sentencing range would have been unchanged at 360 months to life. After the issuance of the PSR, Jackson moved to continue the sentencing hearing for one month to obtain a mental health evaluation to support an argument for a variance from the Guidelines range. The government opposed the continuance, and the district court denied it.

At the May 16, 2016, sentencing hearing, the government presented testimony from Smith's family and a witness to the crime, and the defense offered the testimony of Jackson's mother and cousin. After hearing the arguments of counsel, including Jackson's request for a variance based on Smith's violent history, the district court sentenced Jackson to 480 months imprisonment on the second-degree murder count and 120 months imprisonment on the assault with a deadly weapon count, to be served concurrently, followed by five years of supervised release.

Jackson now appeals his conviction and sentence, arguing the district court committed multiple errors before, during, and after trial.

## II. Discussion

Jackson appeals rulings made by the district court at four stages of the proceedings. First, Jackson argues the district court erred in denying his motion to suppress statements he made to officers six hours after his arrest as the product of unlawful interrogation in violation of his Miranda rights. Second, Jackson contends the district court erred in excluding certain evidence of Smith's violence. Third, Jackson challenges the district court's refusal to permit his counsel to offer a surrebuttal closing argument. Finally, Jackson asserts that his sentence is procedurally and substantively unreasonable and that the district court erred in refusing to continue his sentencing hearing. The court addresses these arguments in turn.

### A. Motion to Suppress

Before trial, Jackson moved to suppress all the statements he made to interviewing officers on the day of his arrest as a violation of his Miranda rights. The court held a suppression hearing at which tribal officer Jacob Gadewoltz, Federal Bureau of Investigation (FBI) Agent Chad Coulter, and the defendant testified. Following the hearing, the district court denied the motion, concluding that the officers' questions did not amount to interrogation and thus did not violate Miranda. We review the district court's factual findings for clear error and its legal conclusions de novo. See United States v. Laurita, 821 F.3d 1020, 1023 (8th Cir. 2016).

Jackson was arrested at 5:13 p.m., two hours after Smith's death, pursuant to tribal charges and a federal warrant dated March 19, 2014, for violating the terms and conditions of supervised release from a 2011 burglary conviction. Officer Gadewoltz arrested Jackson, read him Miranda warnings, and took him to the Justice Center.

FBI Agents Coulter and Bruce Bennett and Bureau of Indian Affairs Agent Gerald White went to the Justice Center to swab Jackson's fingers for DNA evidence and to attempt to interview him. They set up in the jail administrator's unoccupied office, arranging four chairs for the three agents and Jackson. Jackson was escorted to the office at 9:53 p.m. and was seated, unrestrained, in the empty chair closest to the door. Agent Coulter described Jackson as looking "sick and exhausted," sitting with his arms folded and bent over.

Agent Coulter, who took notes during the interview and later drafted a report, asked Jackson for information about his family, address, and date of birth, which Jackson provided. Agent Bennett showed Jackson a copy of the federal warrant and asked him if he knew why he was detained. Jackson said he knew of the warrant, but that he did not understand why he was in jail. Jackson also provided the name of his probation officer at the agent's request.

Then, Agent Coulter asked and received Jackson's consent to swab his hands. Toward the end of the swabbing process, Agent Bennett asked about the events from earlier in the day, and Jackson responded that he would prefer to have an attorney present to discuss it. According to Agent Coulter's testimony, Jackson then "voluntarily blurted out" that he had been "slamming meth," that he had been up for several days since his birthday, and that the only sleep he had was in the jail just prior to the interview. Agent Coulter also testified that Jackson used the phrases "fucked up" and "don't remember." Contrary to Agent Coulter, Jackson testified that these statements were made in response to questions from the officers regarding his drug use and how long he had been awake.

Following these statements, Jackson pulled his knees to his chest and clutched his arms around them. Agent Coulter testified that at this point the officers tried to ascertain Jackson's mental and physical state. They asked him about medications and allergies and to rate his well-being on a scale of one to ten. Jackson responded he

-6-

was not taking any prescription medications, had no allergies, and rated his well-being at a level three. Agent Bennett also asked Jackson, "Do you know when you last cut your hair?" Jackson answered that he did not know. Agent Coulter testified that this question was posed because Jackson's t-shirt had a substantial amount of hair along the shoulders and the officers were trying "to determine if he even knows what that day's date was."

At the end of the interview, the conversation returned to the revocation warrant and Jackson stated that he wanted an attorney present to discuss it. Jackson was returned to his cell at 10:14 p.m.

On appeal, Jackson challenges the district court's conclusion that the officers' questions during this interview did not amount to interrogation in violation of his Miranda rights. Once an accused who is in custody "expresse[s] his desire to deal with the police only through counsel," he shall not be "subject to *further interrogation* by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484–85 (1981). It is undisputed that Jackson was in custody at the time of the interview, that Officer Gadewoltz read Jackson his Miranda rights immediately following his arrest, and that Jackson invoked his right to counsel twice during the interview. Counsel was not made available to Jackson during the interview, nor does the government argue that Jackson initiated further communication with the officers. Therefore, if the interview of Jackson amounted to interrogation, then it was in violation of Jackson's Fifth Amendment right to counsel, and his statements should have been suppressed. See id. at 486 ("Absent such interrogation, there would have been no infringement of the right [to counsel] that Edwards invoked . . . ."); see also Arizona v. Mauro, 481 U.S. 520, 527 (1987) (holding that an officer's actions following the defendant's invocation of right to counsel did not amount to interrogation in violation of Miranda and upholding admission of the conversation).

-7-

Interrogation occurs when a law enforcement officer engages in "either express questioning or its functional equivalent," which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 300–01 (1980) (footnotes omitted). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Id. at 301. Because Jackson made several statements purportedly in response to separate questions from the officers, we analyze each statement separately. See Pennsylvania v. Muniz, 496 U.S. 582, 590–605 (1990).

**1. Drug Use and Lack of Sleep**

Jackson argues that the district court should have suppressed his statements regarding drug use and lack of sleep. At the hearing, Agent Coulter and Jackson offered contrary testimony: Agent Coulter testified that Jackson volunteered that he had been awake for days, injected methamphetamine, and used the phrases "fucked up" and "don't remember;" whereas Jackson testified that these statements were made in response to specific police questions. The district court adopted Agent Coulter's version of the events, concluding that Jackson "voluntarily stated" this information. "Volunteered statements of any kind" are not the product of police interrogation and thus "are not barred by the Fifth Amendment." Miranda v. Arizona, 384 U.S. 436, 478 (1966); see United States v. Lockett, 393 F.3d 834, 837 (8th Cir. 2005) (holding that statements that "were not made in response to police questioning" "were voluntarily made, and their admission was not in violation of Miranda"). We cannot find that the district court clearly erred in crediting Agent Coulter's testimony over Jackson's. See United States v. Tail, 459 F.3d 854, 857–58 (8th Cir. 2006) (finding no clear error in the district court's adoption of the agent's account of his conversation with the defendant).

**2. Physical and Mental Health**

Following Jackson's voluntary statements about drug use and sleep deprivation, he curled up into the fetal position in his chair, and the officers asked Jackson if he took any prescription medications or had any allergies and asked him to rate his well-being on a scale of one to ten. Agent Coulter testified the questions were motivated by a concern for Jackson's physical and mental health. Jackson argues that his responses should be excluded as the product of interrogation.

Given the very limited nature of the questions asked by the officers regarding Jackson's health, we conclude that they were not "reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301. The question regarding medications and allergies required only a yes or no response, and the rating of well-being required only a numerical response. From Jackson's perspective, these questions would not reasonably be viewed as seeking incriminating evidence.

Moreover, because Jackson voluntarily disclosed that he had been awake for several days and using drugs, the agents' follow-up questions regarding his health do not constitute an interrogation. See Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989) ("An officer's attempt to seek clarification of an ambiguous statement is not generally construed as interrogation for Miranda purposes if the question does not enhance the defendant's guilt or raise the offense to a higher degree[.]" (internal quotation omitted)); see United States v. Jones, 842 F.3d 1077, 1083 (8th Cir. 2016) (holding that officer who asked defendant what he meant after he said "You finally fucking got me" was admissible because "[a]n officer's request for clarification of a spontaneous statement does generally not amount to interrogation" (alteration in original) (internal quotation omitted)).

Jackson argues that because the officers knew his federal warrant was in part for methamphetamine use, he had not slept, and he had recently been high on meth,

they were aware of his "unusual susceptibility" to questioning, particularly about medications and mental health. Innis, 446 U.S. at 302 n.8 ("Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect."). However, this knowledge would have also raised concerns about Jackson's physical and mental health and the limited questioning related to those concerns did not represent an attempt to persuade him to speak about the crimes.

### 3. Haircut

Finally, Jackson argues that Agent Bennett's question about the last time he cut his hair exceeded the scope of permissible questioning and became interrogation. Adopting Agent Coulter's explanation, the district court lumped the haircut question in with those concerning medications, allergies, and well-being, finding them permissible because they were "meant to ascertain the status of Jackson's health" and because the agents had no reason to know "such questions would elicit any incriminating response."

Regardless of its relevance, if any, to assessing Jackson's health, the question regarding Jackson's last haircut crossed the line into improper interrogation. At the suppression hearing, Agent Coulter testified that prior to interviewing Jackson, he and Agent Bennett went to the apartment where Jackson was arrested, interviewed witnesses, and discussed the case with other officers. At the apartment, there "was discussion about recently cut hair" and the officers learned that the murder suspect "had his hair cut that evening at that apartment." Because the officers had prior knowledge about the murder suspect having recently cut his hair, they should have known that the question regarding Jackson's last haircut "was reasonably likely to

-10-

elicit an incriminating response" from Jackson regarding the murder. Innis, 446 U.S. at 301 (footnote omitted).

In United States v. Cowan, 674 F.3d 947 (8th Cir. 2012), an officer was questioning the defendant, who was suspected of trafficking crack cocaine from Chicago, in an apartment. The officer first asked how the defendant arrived at the apartment, which the court concluded was a permissible request for basic identification information. Id. at 958. The defendant responded that he arrived by bus from Chicago. The officer next asked why the defendant had car keys if he arrived by bus. Id. The court concluded this question constituted an interrogation under Miranda because the officer "had information linking both the crack cocaine and Cowan to Chicago" and then "asked about an item the officers suspected linked the defendant to a crime." Id. Like in Cowan, the agents had information linking both the murder suspect and Jackson to a recent haircut. They should have been aware that the question regarding his haircut called for an answer that was directly related to the events earlier in the day—a topic that Jackson refused to discuss without counsel present. Agent Bennett knew that the suspect cut his hair at the apartment he fled to after the murder, and he suspected Jackson was responsible for stabbing Smith. Thus, he "should reasonably [have been] aware that the information sought," i.e., that Jackson had a haircut earlier that day, was "directly relevant" to linking Jackson "to the substantive offense." Id. (alteration in original) (quoting United States v. Brown, 101 F.3d 1272, 1274 (8th Cir. 1996)).

The government argues that even if the district court should have suppressed Jackson's response of "I don't know" to the haircut question, admission of the statement was harmless error. The haircut question and Jackson's answer were brought out several times at trial: during Agent Coulter's direct examination, Jackson's cross examination, and the government's closing argument. At closing, the government relied on this exchange to challenge the "credibility of the defendant's testimony" at trial, arguing that if Jackson was "that lacking in memory" on the night

-11-

of the incident such that he could not remember a haircut that occurred hours earlier, then "you have reason to question how a year-and-a-half later, when he's on the witness stand, he's able to give you all of those details." Thus, the harm from admission of the haircut exchange, if any, comes not from the fact that Jackson had a haircut—which was introduced several times at trial by other witnesses[3]—but rather in the injury to Jackson's credibility.

We recognize that a defendant's credibility can be "vital to his self-defense claim." Fields v. Leapley, 30 F.3d 986, 991 (8th Cir. 1994). Where, as here, a defendant relying on a self-defense theory testifies at trial, we must carefully guard against improper admission of statements made by the defendant in violation of Miranda that are used to attack his credibility. Cf. id. (holding that the government's two references during closing to defendant's invocation of his Miranda rights in order to impeach the credibility of his testimony at trial were not harmless error). Nevertheless, "[t]he admission of statements obtained in violation of Miranda may constitute harmless error where there remains overwhelming independent evidence as to the defendant's guilt." United States v. Thomas, 664 F.3d 217, 223 (8th Cir. 2011) (quoting Chavez v. Weber, 497 F.3d 796, 805 (8th Cir. 2007)).

At trial, Jackson admitted that he was responsible for Smith's death, but argued that the killing was done in self defense. Aside from Jackson, three other eyewitnesses testified regarding the altercation between Jackson and Smith: Neal Hale and two drivers on the roadway. All three supported the government's theory of the case. Moreover, Jackson's cousin, brother, and girlfriend testified about Jackson's statements and actions immediately following the incident, which were

---

[3]Several witnesses, including Jackson's girlfriend, Jackson's brother, the friend who cut Jackson's hair, and Jackson himself, testified that Jackson had his hair cut on the day of the incident. See United States v. Eagle, 498 F.3d 885, 889 (8th Cir. 2007) (corroboration by other witnesses supports conclusion of harmless error).

inconsistent with self defense. Thus, Jackson's testimony was the primary evidence in support of self defense.

Considering the record as a whole, see United States v. Hasting, 461 U.S. 499, 508 (1983), it is "unlikely" that the single statement that Jackson did not know when he cut his hair had a "major impact on the jury in determining whether [Jackson] w[as] believable," Flittie v. Solem, 775 F.2d 933, 944 (8th Cir. 1985) (en banc). Aside from Jackson not remembering the haircut, there was substantial other evidence introduced at trial which suggested that Jackson's memory of the incident was unreliable. Notably, the jury heard that Jackson voluntarily revealed to officers that he had been using methamphetamine and had not slept. Jackson's girlfriend and his cellmate also testified that Jackson was under the influence of methamphetamine on the day of the offense and did not remember what happened.

Accordingly, although it was error to admit Jackson's response to the officer's question regarding the last time he cut his hair, the admission was harmless.

## B. Motion in Limine to Admit Smith's Prior Violence

Prior to trial, Jackson moved in limine to admit eight pieces of evidence relating to Smith's prior violence under Federal Rules of Evidence 404(b),[4]

---

[4]Federal Rule of Evidence 404(b)(1) provides that prior acts are "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

404(a)(2),[5] and 405(a).[6] The district court permitted testimony regarding Smith hitting Sabrina Grinnell in her jaw in March 2014, Smith hitting Jackson's sister in the face in January 2014, and Smith pulling out a gun and pointing it at Jackson and his cousin in his cousin's home a few days prior to Smith's death. The district court excluded the remainder of the evidence offered by Jackson, and he appeals four such exclusions. We review the district court's evidentiary rulings for abuse of discretion. United States v. Drapeau, 644 F.3d 646, 654 (8th Cir. 2011).

First, Jackson challenges the district court's refusal to permit evidence of Smith firing eight shots into Jackson's home in 2006. The district court excluded the act because Jackson failed to offer sufficient proof that Smith was responsible for the shooting. Second, Jackson argues the district court should have allowed him to introduce Smith's 2013 stabbing of Wayne Zaste in the chest. The district court excluded this incident because Jackson provided none of the facts of the stabbing, such as where it took place or whether Smith was charged. As to these two specific acts, "[t]he district court did not abuse its discretion in denying the offer of proof," as Jackson failed to provide the court with sufficient evidence to judge the relevance and reliability of the evidence. United States v. Gregg, 451 F.3d 930, 936 (8th Cir. 2006) (affirming exclusion of prior bad acts of victim where the offer of proof

[5]Pursuant to Federal Rule of Evidence 404(a)(2)(B), "a defendant may offer evidence of an alleged victim's pertinent trait."

[6]Federal Rule of Evidence 405(a) states:

> When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct.

identified "no specific instances of James's prior conduct"); see United States v. Two Eagle, 318 F.3d 785, 794 (8th Cir. 2003) (finding no abuse of discretion in excluding evidence of the victim's prior violence used to support the defendant's self-defense claim because "none of the proffered evidence indicated [the victim]'s level of involvement in the prior incident" or when it occurred).

Next, Jackson argues Wayne Zaste should have been allowed to offer reputation and opinion testimony as to Smith's violence. Any error in omitting this testimony was harmless because it "presented no facts not already before the jury." Gregg, 451 F.3d at 936 n.7. Four other witnesses testified to Smith's reputation for violence. And the district court admitted several specific acts of Smith's violence. Additional testimony from Zaste on Smith's violent character would have been cumulative and, as the district court held, excludable under Rule 403. See United States v. Waloke, 962 F.2d 824, 830 (8th Cir. 1992).

Finally, Jackson contends the district court erred in excluding Smith's stabbing of Jackson in 2006, when the boys were about 15 years old. This presents a closer question. Relying on United States v. Milk, 447 F.3d 593 (8th Cir. 2006), the district court excluded the incident under Rule 403, concluding that its probative value was weak because it was too remote in time, there were no independent witnesses, and no criminal charges were ever filed. Milk, however, is distinguishable because there the victim stabbed a mutual acquaintance, not the defendant, and the victim and defendant had since remained close friends. Given that the present incident involved the victim stabbing the defendant and was relevant to establishing a long-term feud between the two, the 2006 incident had probative value. Nonetheless, the district court was within its "wide discretion" in concluding that admission of this incident would necessitate a collateral mini-trial as to the facts of the stabbing and the person at fault. Waloke, 962 F.2d at 830. "[I]n the face of the admission of significant testimony regarding [Smith]'s prior acts and reputation testimony regarding [Smith]'s

violent character, we cannot say that the exclusion of other, cumulative character evidence 'had more than a slight influence on the verdict.'"  United States v. Bordeaux, 570 F.3d 1041, 1051 (8th Cir. 2009) (quoting Gregg, 451 F.3d at 933).[7]

## C. Motion to Present Surrebuttal Closing Argument

Federal Rule of Criminal Procedure 29.1 provides that the government presents its closing argument first, the defense follows, and the government closes with its rebuttal.  Jackson argues that this rule violates his constitutional right to be proven guilty beyond a reasonable doubt because it gives the government a strategic advantage to speak twice and speak last.  Jackson contends that because he bore the burden of proof on his claim of self defense, he should have been afforded the opportunity to deliver a rebuttal closing argument.  Similarly, in United States v. Byrd, 834 F.2d 145 (8th Cir. 1987), the defendant argued that because he carried the burden of proving his affirmative defense of insanity, he had a constitutional right to a rebuttal closing argument.  Id. at 147.  We rejected the argument, stating:

> Rule 29.1 does not establish a constitutional doctrine, but rather, provides a uniform rule of federal practice.  The purpose of the rule is to give the defendant the chance to respond to the government's case and argument in an informed manner.  Rebuttal provides the government with the opportunity to respond to defendant's arguments.  It

---

[7]Jackson claims for the first time on appeal that he was denied his Sixth Amendment right to compulsory process because the district court excluded witnesses that were essential to his case.  Because Jackson does not identify the specific witnesses or any of the testimony they would have presented, his claim must fail.  See United States v. Ladoucer, 573 F.3d 628, 635 (8th Cir. 2009) ("The defendant must show that the excluded testimony 'would have been both material and favorable to his defense.'" (quoting United States v. Turning Bear, 357 F.3d 730, 733 (8th Cir. 2004))).

> does not allow the government to bring in new matters. Consequently, the order of argument works no injustice upon the defendant. The district court has broad discretion to ensure a fair procedure in final arguments.

Id. (internal citation omitted). For the reasons articulated by the Byrd court, we reject Jackson's constitutional challenge to Rule 29.1.

Furthermore, the district court did not abuse its discretion in denying Jackson a rebuttal closing argument. See United States v. Miller, 621 F.3d 723, 729 (8th Cir. 2010). Where the government's rebuttal does not exceed the scope of the defendant's closing argument, the court need not grant defendant a surrebuttal. See United States v. Purkey, 428 F.3d 738, 759 (8th Cir. 2005). In its order denying Jackson's pretrial motion for surrebuttal argument, the district court stated that if the government raised new matters in its rebuttal argument, it would entertain a renewed argument for surrebuttal time. But Jackson did not renew his motion after the government's closing argument,[8] nor did he argue on appeal that the government's rebuttal exceeded its proper scope. In fact, Jackson never proffered to the district court specifically what he sought to rebut. Therefore, the district court did not err in denying Jackson a surrebuttal closing argument.

**D. Sentencing**

The district court sentenced Jackson to 480 months imprisonment, a sentence within the Guidelines range of 360 months to life. Jackson argues the court erred in failing to consider and grant a variance based on the victim's conduct, to consider a

---

[8]Prior to either party's closing arguments, Jackson again moved for surrebuttal argument. As the scope of the government's rebuttal was still unknown at that time, the renewal of the motion was premature.

variance based on a forthcoming Guidelines amendment, and to grant a continuance to conduct a mental health examination of Jackson.

First, Jackson contends that the district court erred in failing to consider a variance based on the factors outlined in USSG § 5K2.10. Because Jackson failed to raise this procedural error before the district court, we review for plain error. See United States v. Black, 670 F.3d 877, 881 (8th Cir. 2012). Section 5K2.10 provides that "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense." USSG § 5K2.10. Although a defendant may seek a departure pursuant to § 5K2.10, Jackson did not request a departure before the district court; instead, he asked only that the court consider this section in support of his request for a lower sentence. At sentencing, Jackson presented additional evidence of Smith's violence beyond that presented at trial, including a 2010 prison beating of Jackson by Smith's friends and Smith's felonies for stabbing and terrorizing.

Contrary to Jackson's contention, the district court considered and explicitly rejected Jackson's request for a variance under § 5K2.10. The district court stated that it reviewed Jackson's sentencing memorandum and exhibits, the trial testimony, the sentencing testimony, and the arguments of counsel. At each of these stages, the court heard evidence and argument regarding Smith's violent conduct and the application of § 5K2.10. After considering the evidence of the "long-standing family disputes" between the Smiths and the Jacksons, the court refused to grant any variances or departures. We find no error in the court's consideration of the variance.

Second, Jackson also appears to argue that the district court erred in refusing to grant a variance based on the factors in § 5K2.10.[9] We review the district court's refusal to grant a downward variance for abuse of discretion. See United States v. Sethi, 702 F.3d 1076, 1081 (8th Cir. 2013). The district court found that Smith's conduct did not contribute significantly to provoking the stabbing, stating:

> You might have hated Mr. Smith, but all you had to do was drive by that day when you saw him in the ditch, flip him the bird and keep driving, you know, move on with your life. You didn't have to stop in the ditch, jump out of the vehicle, throw your hat off and go confront him. And I understand he threw the first punch, but you brought a knife to a fist fight, and it's not a fair fight.

---

[9]In deciding whether a sentence reduction is warranted under USSG § 5K2.10, the court should consider:

> (1) The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.
> (2) The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.
> (3) The danger reasonably perceived by the defendant, including the victim's reputation for violence.
> (4) The danger actually presented to the defendant by the victim.
> (5) Any other relevant conduct by the victim that substantially contributed to the danger presented.
> (6) The proportionality and reasonableness of the defendant's response to the victim's provocation.

USSG § 5K2.10.

To the extent that Jackson challenges the district court's failure to grant a variance, we conclude that the court carefully considered the defendant's and victim's conduct preceding the offense behavior and did not abuse its discretion in refusing to grant the requested variance.

Third, Jackson argues that the district court should have considered a variance because under the forthcoming 2016 Sentencing Guidelines, his 2011 burglary conviction would no longer be a qualifying offense for career offender status. Jackson did not argue for a variance on this ground to the district court, therefore we review only for plain error. See United States v. Elodio-Benitez, 672 F.3d 584, 586 (8th Cir. 2012). Our case law makes clear that "the district court was not required to consider the pending guidelines amendment" before imposing sentence. United States v. Riehl, 779 F.3d 776, 778 (8th Cir. 2015) (per curiam) (quoting United States v. Allebach, 526 F.3d 385, 389 (8th Cir. 2008)). Nonetheless, the district court here considered the upcoming change. It reviewed the PSR, which applied the 2015 Guidelines, but recognized that burglary would be stricken from the list of qualifying offenses in 2016 and noted that this change would have "no impact on the defendant's guidelines range" of 360 months to life. At the sentencing hearing, the government also explained this change and its lack of effect on the Guidelines range. Because the district court was aware of the forthcoming Guidelines change and the revision had no impact on Jackson's sentencing range, we find no plain error in the district court's failure to sua sponte consider a variance based on a proposed amendment to the Sentencing Guidelines. See Allebach, 526 F.3d at 389 (finding no error where district did consider the effect of the amendment and the sentence was "within the guidelines under the then-current guidelines and the amendment").

Finally, Jackson argues that the district court should have granted his motion to continue his sentencing in order for him to obtain a mental health evaluation. Continuances "should be granted only when the party requesting one has shown a

compelling reason. We will reverse a district court's decision to deny a motion for a continuance only if the court abused its discretion and the moving party was prejudiced by the denial." United States v. Jones, 643 F.3d 275, 277 (8th Cir. 2011) (quoting United States v. Lakoskey, 462 F.3d 965, 980 (8th Cir. 2006)). Jackson moved for a continuance six days prior to the sentencing hearing, arguing that his addiction issues, a 2010 head injury, and suicidal thoughts in 2014 warranted the grant of additional time to obtain a psychological evaluation. He did not argue that he lacked competence to proceed. Because the bases for the requested evaluation were well known to the defense long before sentencing, Jackson had not demonstrated a compelling reason for a continuance. Moreover, Jackson has not established that the absence of a mental health evaluation prejudiced him at sentencing. The PSR stated that Jackson had undergone a mental health evaluation in 2010, and there is no basis to conclude that another evaluation would produce different results or that those results would have led the court to impose a lesser sentence. See id. at 278.

## III. Conclusion

For the reasons stated herein, we affirm.

_____